IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

DALE JEROME TERRELL,

    **Plaintiff,**

    v.                                              CASE NO. 25-3003-JWL

(FNU) MUNK, et al.,

    **Defendants.**

## MEMORANDUM AND ORDER

Plaintiff, Dale Jerome Terrell, who is currently incarcerated at the Larned State Correctional Facility in Larned, Kansas ("LSCF"), brings this pro se civil rights case under 42 U.S.C. § 1983. The Court granted Plaintiff leave to proceed in forma pauperis. On January 23, 2025, the Court entered a Memorandum and Order (Doc. 5) ("M&O) ordering Plaintiff to show good cause why his claims against Defendants KDOC, Warden Easley, and Deputy Warden Loomis, and Plaintiff's claims in Counts II and III, should not be dismissed for the reasons stated in the M&O. The Court also found that the proper processing of Plaintiff's claims cannot be achieved without additional information from appropriate Kansas Department of Corrections ("KDOC") officials and ordering the preparation of a *Martinez* Report. The *Martinez* Report (Doc. 14) (the "Report") was filed on April 22, 2025, and the Court received the conventionally-filed exhibits to the Report on May 1, 2025, and supplements to the Report on May 19, 2025. (Docs. 18, 23.) The M&O provides that "[o]nce the report has been received, the Court can properly screen Plaintiff's Complaint under 28 U.S.C. § 1915A." (Doc. 5, at 8.) The Court's screening standards are set forth in detail in the Court's M&O.

**I.  Nature of the Matter before the Court**

Plaintiff alleges in his Complaint that on September 30, 2024, officers Cook, Munk,

Sweeny, and Nusbaun, executed a double cell extraction on Plaintiff at LSCF. (Doc. 1, at 3, 4.) Plaintiff alleges that they deployed pepper spray then placed Plaintiff in a clinic cell without an eye rinse. *Id*. at 3. Plaintiff alleges that twenty minutes later they executed a second cell extraction on Plaintiff in the clinic. *Id*. In the process of the second extraction, Plaintiff was hit with a shock shield while he was naked laying in water. *Id*. Plaintiff alleges that after Plaintiff was placed in handcuffs, Sgt. Baker struck Plaintiff in the face with his shield, gashing his eye open. *Id*.

As Count I, Plaintiff alleges cruel and unusual punishment in violation of the Eighth Amendment based on the cell extractions. *Id*. at 4. As Count II, Plaintiff alleges a due process violation based on the denial of his request for a copy of the incident report and the names of all the officers involved in the extractions under the Kansas Open Records Act, K.S.A. § 45-221. *Id*. As Count III, Plaintiff alleges a violation of the Kansas Open Records Act, K.S.A. § 45-221, based on the denial. *Id*. at 5.

Plaintiff names as defendants: (fnu) Munk, LSCF Sergeant; (fnu) Sweeny, LSCF Sergeant; (fnu) Cook, LSCF Sergeant; (fnu) Nusbaun, LSCF Sergeant; (fnu) Easley, LSCF Warden; (fnu) Loomis, LSCF Deputy Warden; (fnu) Baker, LSCF Sergeant; and the KDOC. For relief, Plaintiff seeks $500,000 in compensatory damages.

Plaintiff filed an Amended Complaint on January 30, 2025, despite the Court's M&O that ordered a *Martinez* Report on the Complaint and provided that the Court would screen Plaintiff's Complaint after the Report was received. *See* Doc. 5, at 8–9. Plaintiff's Amended Complaint drops his claims in Count II and III of his original Complaint, and no longer names as defendants the KDOC, Warden Easley, and Deputy Warden Loomis.

Plaintiff acknowledges in his Amended Complaint that he refused officers' orders to cuff

up. (Doc. 9, at 3.) Plaintiff also alleges that he asked the SORT team to allow him to get the pepper spray off of his body, but "he was not allowed to do so." *Id*. Plaintiff also acknowledges that after he was moved to a different cell, he "flooded the cell." *Id*. Plaintiff claims that he "offered no resistance to the officer's commands and was non-combative." *Id*. Plaintiff acknowledges that he "was able to jerk away from officers." *Id*. at 4. Plaintiff alleges that he was escorted "to segregation totally naked in view of other prisoners and staff, including multiple females." *Id*. at 5. Plaintiff also suggests that he was denied medical care after he was moved the second time. *Id*.

Plaintiff also asserts that he was denied proper medical after the incidents. *Id*. at 5–6. He states that he was prescribed Tylenol/Aspirin for his headaches and referred to an eye doctor for a determination of the cause of the pressure behind his eye. *Id*. at 6. Plaintiff alleges that he was seen by medical professionals for dizziness and was told to drink water and not to make any sudden jerky movements. *Id*. Plaintiff alleges that he "was forced to allow the wound on his face to heal naturally" and when it did "there was a lump underneath the wound." *Id*. Plaintiff received an x-ray and it "came back clean." *Id*. Plaintiff was also scheduled for a CAT scan based on his dizziness, and it "came back negative but the doctor told [him] he was experiencing post-concussion symptoms due to a traumatic head injury." *Id*.

The first three counts in Plaintiff's Amended Complaint are based on the two use of force incidents. As Count IV, he alleges that he was denied medical attention for the wound on his face, and he was not allowed to remove the pepper spray from his body in a timely manner.

**II. The Report**

The Report addresses the two uses of force involving Plaintiff that occurred approximately four hours apart on September 30, 2024. (Doc. 14, at 6–7.) The Report provides

that:

> The first planned use of force on September 30, 2024, was at 1 p.m.. It was in response to plaintiff first having a weapon in his cell and refusing an order to move to a segregation cell, then for refusing to allow restraints to be placed on him prior to the movement. The team assembled for the use of force were Munk, Swinney, Baker, Kraft, Vsetecka and Cook.
> The video of the event beginning about 1 p.m. is complete and shows the force used. In fact, the video and the medical oversight indicates that plaintiff was not injured in the course of the use of force beyond a small abrasion that may have been self inflicted.
> Extended negotiations were conducted, but failed. Before entry, plaintiff was sprayed indirectly by defendant Munk with OC spray three times. Two times were one second sprays and the third [was] for three seconds.
> A shock device was used very briefly at the beginning of the entry into plaintiff's cell and then slid out of the cell. [Plaintiff] was highly aggressive and continued to struggle until he was secured and placed into a wheelchair to transport him to a clinic cell, when plaintiff was placed on a mental health crisis level.
> Plaintiff's cellmate was also allowed to leave the cell as soon as was practicable.
> After he was restrained, plaintiff refused a decontamination shower when offered. Security video reflects that plaintiff sat by a running shower for several minutes and had no interest in showering. Plaintiff did not appear to be injured.
> When plaintiff arrived at the next cell he was to remove his clothing, but refused to do so. Accordingly, plaintiff's clothing was cut off. Plaintiff continued to struggle and his restraints were not removed at that time for the safely of all concerned. At approximately 2 p.m., after extended negotiations, plaintiff agreed to allow the restraints (handcuffs and ankle restraints) to be removed.
> The second use of force occurred three hours later, around 5 p.m.. Plaintiff had spilled water from his toilet onto the floor, had torn the metal receptacle plate off the wall, exposed the wiring and appeared to be trying to hurt himself with electricity. Plaintiff also climbed onto surfaces and threatened to jump and hurt himself. Plaintiff was holding the metal place and threatened to use it as a weapon against staff if they entered his cell.
> A team was again assigned to prevent plaintiff from hurting himself or others. This time the team members were Munk, Swinney, Tudor, Goldman and Younger.

> This time brief negotiations were conducted and failed. No OC spray was used and the team simply entered the cell. Plaintiff went down quickly, but was fighting and struggling.
> This time the shock shield was used multiple times while the team was trying to get control of plaintiff. As plaintiff struggled, the shield worked its way up slightly from plaintiff's torso so that when plaintiff lifted his head and looked toward his left the shield contacted his cheek creating a scratch.
> When plaintiff was restrained again, he was moved to a wheelchair, a towel was placed over his genitals and the medical/mental health staff were contacted for guidance about what to do next. The decision was made to place plaintiff on a mental health level 4 crisis level and move him to a restraint bed until he had time to calm down.
> Accordingly, plaintiff was walked a few feet to the restraint bed. Plaintiff cooperated with the process of getting him onto the restraint bed and being secured there with restraint on both arms and legs and across his chest. Plaintiff's genitals were covered with a towel as he lay on the bed.
> After each use of force, medical personnel examined plaintiff.

*Id*. at 21–23.

### III. Discussion

#### 1. Counts II and III and claims against Defendants KDOC, Warden Easley, and Deputy Loomis

The Court ordered Plaintiff to show good cause why these claims should not be dismissed for the reasons set forth in the Court's M&O. Plaintiff has not responded to the M&O, but filed an Amended Complaint in which he dropped these claims/defendants.

#### 2. Amended Complaint - Eighth Amendment Claims

Plaintiff continues to allege that the cell extractions constituted cruel and unusual punishment in violation of the Eighth Amendment. The Eighth Amendment guarantees a prisoner the right to be free from cruel and unusual punishment. *See Estate of Booker v. Gomez*, 745 F.3d 405, 419 (10th Cir. 2014) (stating that "claims of excessive force involving convicted prisoners arise under the Eighth Amendment").

"[W]henever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 6–7 (1992) (citation omitted). "An excessive-force claim has two elements: (1) an objective element requiring that the alleged wrongdoing be harmful enough to establish a constitutional violation; and (2) a subjective element requiring the plaintiff to show that the officials acted with a sufficiently culpable state of mind." *Ezell v. Hininger*, 2024 WL 1109057, at *2 (10th Cir. 2024) (unpublished) (citing *Redmond v. Crowther*, 882 F.3d 927, 936 (10th Cir. 2018)).

"Physical injury is not required, but the force must be 'objectively harmful enough to establish a constitutional violation[.]'" *Blake v. Wallace*, 2024 WL 5087805, at *3 (10th Cir. 2024) (unpublished) (citing *Wilkins v. Gaddy*, 559 U.S. 34, 37–38 (2010); *Redmond v. Crowther*, 882 F.3d 927, 936 (10th Cir. 2018)). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'" *Hudson*, 503 U.S. at 9–10.

"An official's state of mind is sufficiently culpable "if he uses force maliciously and sadistically for the very purpose of causing harm, rather than in a good faith effort to maintain or restore discipline." *Ezell*, 2024 WL 1109057, at *2 (citing *Redmond*, 882 F.3d at 936) (internal quotation marks omitted)). "Factors to be considered include the officers' reasonable perceptions of the threat and the 'relationship between that need and the amount of force used' and efforts to temper such force." *Blake*, 2024 WL 5087805, at *3 (citing *Hudson*, 503 U.S. at 7).

The Court has viewed the videos submitted as exhibits to the Report. The videos do not support Plaintiff's claims. The videos reflect that designated negotiators were used to attempt negotiations with Plaintiff prior to each use of force. The videos also reflect that Plaintiff refused multiple direct orders and resisted efforts by staff to restrain him. The videos also show the officer giving warnings, followed by the officer watching his wristwatch in what appears to be an attempt to allow a sufficient amount of time after each warning. The officer also appears to be looking at a card with written instructions.

The videos do not show Plaintiff being denied a shower to decontaminate. In fact, the videos show that Plaintiff was offered a shower, refused, and the officers stayed by the shower allowing Plaintiff plenty of time to change his mind. The videos show that Plaintiff was escorted with a towel over his lap and had a towel placed on his lap when he was on the restraint bed.

Courts have held that a plaintiff's refusal "to obey direct orders given multiple times" supports a clear need for force. *Pittman v. Roetker*, 2025 WL 753630, at *4 (D. Colo. 2025). "[P]risoners cannot be permitted to decide which orders they will obey, and when they will obey them." *Id*. (quoting *Redmond*, 882 F.3d at 938 (citation and internal quotation marks omitted)).

### 3. Medical Care

Plaintiff's Amended Complaint adds a claim based on his medical care. Plaintiff alleges in Count IV that he was denied medical attention for the wound on his face, and he was not allowed to remove the pepper spray from his body in a timely manner.

The videos clearly show that Plaintiff was given the opportunity to shower to remove any pepper spray on his body. He refused to shower when he was given the opportunity, commenting that he is not getting up, it's not over, and it is just beginning.

Plaintiff also fails to state a claim regarding his medical care. He was clearly assessed

and offered medical care immediately after the incidents. His allegations in his Amended Complaint show that he received medical care later, including medication, an x-ray, and a CAT scan. Plaintiff has failed to show that any Defendant was deliberately indifferent regarding his medical care. Plaintiff has failed to state a claim based on his alleged denial of a shower and medical care.

## IV. Response Required

The *Martinez* report developed as a means "to ascertain whether there is a factual as well as a legal basis for [a] prisoner's claims." *Gee v. Estes*, 829 F.2d 1005, 1007 (10th Cir. 1987). The report "is treated like an affidavit, and the court is not authorized to accept the factual findings of the prison investigation when the plaintiff has presented conflicting evidence." *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991) (citing *Sampley v. Ruettgers*, 704 F.2d 491, 493 n. 3 (10th Cir. 1983)). Thus, at this point in the proceedings the Court does not use the Report to resolve conflicts of fact. *See Swoboda v. Duback*, 992 F.2d 286, 290 (10th Cir. 1993) ("In determining whether a plaintiff has stated a claim, the district court may not look to the Martinez report, or any other pleading outside the complaint itself, to refute facts specifically pled by a plaintiff, or to resolve factual disputes."). However, the Tenth Circuit has held that "[w]here the video evidence blatantly contradicts a material fact allegation, we may disregard that allegation in favor of what is actually depicted on the video." *Blake v. Wallace*, 2024 WL 5087805, at *2 (10th Cir. Dec. 12, 2024) (unpublished) (citation omitted). In light of the Report, the Court is considering dismissal of this matter for failure to state a claim.

Plaintiff will be given an opportunity to respond to the Report and to show good cause why his Eighth Amendment claims should not be dismissed. Failure to respond by the Court's deadline may result in dismissal of this action without further notice for failure to state a claim.

**IT IS THEREFORE ORDERED BY THE COURT** that Plaintiff is granted until **July 16, 2025,** in which to respond to the Report at Doc. 14, and to show good cause, in writing to the undersigned, why Plaintiff's Eighth Amendment claims should not be dismissed for the reasons stated herein.

**IT IS SO ORDERED**.

**Dated June 16, 2025, in Kansas City, Kansas.**

<u>S/ John W. Lungstrum</u>
**JOHN W. LUNGSTRUM**
**UNITED STATES DISTRICT JUDGE**