IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

**DALE JEROME TERRELL,**

    **Plaintiff,**

    v.                                                        CASE NO. 25-3003-JWL

**(FNU) MUNK, et al.,**

    **Defendants.**

**MEMORANDUM AND ORDER**

Plaintiff, Dale Jerome Terrell, who at the time of filing was incarcerated at the Larned State Correctional Facility in Larned, Kansas ("LSCF"), brings this pro se civil rights case under 42 U.S.C. § 1983. Plaintiff is currently out of custody. The Court granted Plaintiff leave to proceed in forma pauperis. On January 23, 2025, the Court entered a Memorandum and Order (Doc. 5) ("M&O) ordering Plaintiff to show good cause why his claims against Defendants KDOC, Warden Easley, and Deputy Warden Loomis, and Plaintiff's claims in Counts II and III, should not be dismissed for the reasons stated in the M&O. The Court also found that the proper processing of Plaintiff's claims could not be achieved without additional information from appropriate Kansas Department of Corrections ("KDOC") officials and ordered the preparation of a *Martinez* Report.

Plaintiff filed an Amended Complaint (Doc. 9).[1] The *Martinez* Report (Doc. 14) (the "Report") was filed on April 22, 2025. The Court received the conventionally-filed exhibits to the Report on May 1, 2025, and supplements to the Report on May 19, 2025. (Docs. 18, 23.) The Court screened Plaintiff's Amended Complaint and entered a Memorandum and Order (Doc. 24)

---

[1] Plaintiff's original complaint included Counts II and III based on alleged violation of the Kansas Open Records Act. Plaintiff's Amended Complaint drops his claims in Count II and III of his original Complaint, and no longer names as defendants the KDOC, Warden Easley, and Deputy Warden Loomis.

1

("M&O II") granting Plaintiff an opportunity to respond to the Report and to show good cause why his Eighth Amendment claims should not be dismissed for the reasons set forth in the M&O II. This matter is before the Court on Plaintiff's response (Doc. 27) and Motion to Amend Complaint (Doc. 28).

**I. Nature of the Matter before the Court**

Plaintiff's allegations are set forth in detail in the M&O II. In summary, Plaintiff alleges that Defendants used excessive force in violation the Eighth Amendment during two separate cell extractions on September 30, 2024, at LSCF. Plaintiff alleges that they deployed pepper spray then placed Plaintiff in a clinic cell without an eye rinse, and hit Plaintiff with a shock shield while he was naked laying in water. Plaintiff alleges that after he was placed in handcuffs, Sgt. Baker struck Plaintiff in the face with his shield, gashing his eye open.

Plaintiff acknowledges in his Amended Complaint that he refused officers' orders to cuff up. (Doc. 9, at 3.) Plaintiff also alleges that he asked the SORT team to allow him to get the pepper spray off of his body, but "he was not allowed to do so." *Id*. Plaintiff acknowledges that after he was moved to a different cell, he "flooded the cell." *Id*. Plaintiff claims that he "offered no resistance to the officer's commands and was non-combative." *Id*. Plaintiff acknowledges that he "was able to jerk away from officers." *Id*. at 4. Plaintiff alleges that he was escorted "to segregation totally naked in view of other prisoners and staff, including multiple females." *Id*. at 5. Plaintiff suggests that he was denied medical care after he was moved the second time. *Id*.

Plaintiff also asserts that he was denied proper medical after the incidents. *Id*. at 5–6. He states that he was prescribed Tylenol/Aspirin for his headaches and referred to an eye doctor for a determination of the cause of the pressure behind his eye. *Id*. at 6. Plaintiff alleges that he was seen by medical professionals for dizziness and was told to drink water and not to make any sudden

jerky movements. *Id*. Plaintiff alleges that he "was forced to allow the wound on his face to heal naturally" and when it did "there was a lump underneath the wound." *Id*. Plaintiff received an x-ray and it "came back clean." *Id*. Plaintiff was also scheduled for a CAT scan based on his dizziness, and it "came back negative but the doctor told [him] he was experiencing post-concussion symptoms due to a traumatic head injury." *Id*.

The first three counts in Plaintiff's Amended Complaint are based on the two use of force incidents. As Count IV, he alleges that he was denied medical attention for the wound on his face, and that he was not allowed to remove the pepper spray from his body in a timely manner.

## II. Discussion

The details of the Report are set forth in the M&O II. After reviewing the report and viewing the videos submitted with the Report, the Court found that Plaintiff's Eighth Amendment claims were subject to dismissal. The Court found that the videos do not support Plaintiff's claims. The videos reflect that designated negotiators were used to attempt negotiations with Plaintiff prior to each use of force. The videos also reflect that Plaintiff refused multiple direct orders and resisted efforts by staff to restrain him. The videos also show the officer giving warnings, followed by the officer watching his wristwatch in what appears to be an attempt to allow a sufficient amount of time after each warning. The officer also appears to be looking at a card with written instructions.

The videos do not show Plaintiff being denied a shower to decontaminate. In fact, the videos show that Plaintiff was offered a shower, refused, and the officers stayed by the shower allowing Plaintiff plenty of time to change his mind. The videos show that Plaintiff was escorted with a towel over his lap and had a towel placed on his lap when he was on the restraint bed.

The videos clearly show that Plaintiff was given the opportunity to shower to remove any pepper spray on his body. He refused to shower when he was given the opportunity, commenting

3

that he is not getting up, it's not over, and it is just beginning.

The Court found in the M&O II that Plaintiff failed to state a claim regarding his medical care. He was clearly assessed and offered medical care immediately after the incidents. His allegations in his Amended Complaint show that he received medical care later, including medication, an x-ray, and a CAT scan. The Court found that Plaintiff failed to show that any Defendant was deliberately indifferent regarding his medical care. Plaintiff failed to state a claim based on his alleged denial of a shower and medical care.

Plaintiff has filed a response to the M&O II. (Doc. 27.) The only issue Plaintiff addresses in his response is the use of the shock shield during the second cell extraction while Plaintiff was "in two inches of water." *Id*. at 1. Plaintiff alleges that water is a conductor, so it would multiply the voltage and thereby render the force excessive. *Id*. Plaintiff states in his response that before officers used the shield, he informed them that they could not use the electric shield while he was in water. *Id*. at 2. Plaintiff alleges that when officers entered the cell for the second extraction, he "did not resist" and "immediately covered his body with a protective blanket to shield his body from the electric shield in a protective manner non[-]lethal or aggressive." *Id*. Plaintiff alleges that he was not aggressively fighting the officers but was simply pushing the shield away. *Id*. Plaintiff alleges that the shock shield was activated multiple times for multiple seconds at a time. *Id*. at 2–3. Plaintiff alleges that the officers could have used a regular, non-electric shield. *Id*. at 3. Plaintiff filed a motion to amend Count I to allege that officers used excessive force by using the shock shield while he was in two inches of water. (Doc. 28, at 1.)

Plaintiff's response and motion to amend only address the use of the shock shield while Plaintiff was standing in water. Plaintiff has not addressed his medical care, the first cell extraction, or the claim that he was not allowed to rinse pepper spray from his eyes or body.

Plaintiff has failed to show good cause why his Eighth Amendment claims—including a claim regarding the use of the shock shield—should not be dismissed for failure to state a claim. The Eighth Amendment guarantees a prisoner the right to be free from cruel and unusual punishment. *See Estate of Booker v. Gomez*, 745 F.3d 405, 419 (10th Cir. 2014) (stating that "claims of excessive force involving convicted prisoners arise under the Eighth Amendment").

"[W]henever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 6–7 (1992) (citation omitted). "An excessive-force claim has two elements: (1) an objective element requiring that the alleged wrongdoing be harmful enough to establish a constitutional violation; and (2) a subjective element requiring the plaintiff to show that the officials acted with a sufficiently culpable state of mind." *Ezell v. Hininger*, 2024 WL 1109057, at *2 (10th Cir. 2024) (unpublished) (citing *Redmond v. Crowther*, 882 F.3d 927, 936 (10th Cir. 2018)).

"Physical injury is not required, but the force must be 'objectively harmful enough to establish a constitutional violation[.]'" *Blake v. Wallace*, 2024 WL 5087805, at *3 (10th Cir. 2024) (unpublished) (citing *Wilkins v. Gaddy*, 559 U.S. 34, 37–38 (2010); *Redmond v. Crowther*, 882 F.3d 927, 936 (10th Cir. 2018)). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'" *Hudson*, 503 U.S. at 9–10.

"An official's state of mind is sufficiently culpable "if he uses force maliciously and sadistically for the very purpose of causing harm, rather than in a good faith effort to maintain or

5

restore discipline." *Ezell*, 2024 WL 1109057, at *2 (citing *Redmond*, 882 F.3d at 936) (internal quotation marks omitted)). "Factors to be considered include the officers' reasonable perceptions of the threat and the 'relationship between that need and the amount of force used' and efforts to temper such force." *Blake*, 2024 WL 5087805, at *3 (citing *Hudson*, 503 U.S. at 7).

Courts have held that a plaintiff's refusal "to obey direct orders given multiple times" supports a clear need for force. *Pittman v. Roetker*, 2025 WL 753630, at *4 (D. Colo. 2025). "[P]risoners cannot be permitted to decide which orders they will obey, and when they will obey them." *Id*. (quoting *Redmond*, 882 F.3d at 938 (citation and internal quotation marks omitted)).

The Report addresses the second cell extraction and the use of the shock shield. The Report provides in relevant part that:

> The second use of force occurred three hours later, around 5 p.m.. Plaintiff had spilled water from his toilet onto the floor, had torn the metal receptacle plate off the wall, exposed the wiring and appeared to be trying to hurt himself with electricity. Plaintiff also climbed onto surfaces and threatened to jump and hurt himself. Plaintiff was holding the metal plate and threatened to use it as a weapon against staff if they entered his cell.
> A team was again assembled to prevent plaintiff from hurting himself or others. This time the team members were Munk, Swinney, Tudor, Goldman and Younger.
> This time brief negotiations were conducted and failed. No OC spray was used and the team simply entered the cell. Plaintiff went down quickly, but was fighting and struggling.
> This time the shock shield was used multiple times while the team was trying to get control of plaintiff. As plaintiff struggled, the shield worked its way up slightly from plaintiff's torso so that when plaintiff lifted his head and looked toward his left the shield contacted his cheek creating a scratch.
> When plaintiff was restrained again, he was moved to a wheelchair, a towel was placed over his genitals and the medical/mental health staff were contacted for guidance about what to do next. The decision was made to place plaintiff on a mental health level 4 crisis level and move him to a restraint bed until he had time to calm down.
> Accordingly, plaintiff was walked a few feet to the restraint bed. Plaintiff cooperated with the process of getting him onto the

> restraint bed and being secured there with restraint on both arms and legs and across his chest. Plaintiff's genitals were covered with a towel as he lay on the bed.
>
> After each use of force, medical personnel examined plaintiff.

(Doc. 14, at 22–23.) The Court has reviewed the KDOC's use of force policy (IMPP 12-111A) submitted with the Report, and it does not appear to address use of the shock shield when an inmate is in contact with water. (Doc. 15, at 5–6, 8, Sealed.)[2]

The incident in this case is similar to the use of force in *Garris v. Averett*. *See Garris v. Averett*, 2014 WL 4727087 (E.D. N.C. 2014). In *Garris*, the plaintiff's cell and the hallway floor were flooded with soapy water. *Id*. at *3. As officers opened plaintiff's cell door, "plaintiff rushed out of his cell using his mattress as a shield and pushed toward the AUOF team." *Id*. The officer "used the electronic stun shield to push plaintiff back into his cell, and the AUOF team struggled with plaintiff in the doorway of plaintiff's cell." *Id*. The plaintiff continued to struggle after he was placed face-down onto the floor, and the officer "deployed the electronic stun shield for approximately eight seconds." *Id*.

The court in *Garris* addressed the factors set forth in *Whitley v. Albers* in finding that the plaintiff failed to satisfy the subjective prong of the Eighth Amendment test. *Id*. at *6 (citing *Whitley v. Albers*, 475 U.S. 312, 319 (1986), *overruled on other grounds by Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). The relevant factors include: "(1) the need for the application of force; (2) the relationship between the need and the amount of force used; (3) the threat reasonably perceived by the responsible officials; and (4) any efforts made to temper the severity of a forceful response."[3] *Id*. (citing *Whitley*, 475 U.S. at 321; *Hudson v. McMillian*, 503 U.S. 1, 7 (1992)). The

---

[2] The exhibit was filed under seal because the policy is designated "Staff Read Only."
[3] These factors are basically the same as those stated by the Tenth Circuit. *See Blake*, 2024 WL 5087805, at *3 (citing *Hudson*, 503 U.S. at 7).

court found in relevant part that:

> With respect to the need for force factor, the record reflects that plaintiff set a small fire in his cell, blocked his food service trap, covered his windows, and flooded his cell with soapy water. The record additionally reflects that plaintiff refused to comply with officers' repeated direct orders to voluntarily submit to restraints. Once defendant Jones ordered the Hcon control booth to open plaintiff's cell door, plaintiff pushed out of his cell toward the AUOF team using his mattress as a shield. The video tape of the incident reflects that plaintiff continued to resist the AUOF team's efforts to bring plaintiff to the floor so that the team could apply restraints. Based upon the evidence, the court finds that this *Whitley* factor weighs in favor of defendants and against plaintiff.
>
> The court next considers the relationship between the need for force and the amount of force that was used. On the date in question, the AUOF team was confronted with a non-compliant and violent inmate. Although plaintiff alleges that he voluntarily submitted to restraints, the video clearly contradicts plaintiff's statement in that plaintiff can be seen charging out of his cell pushing his mattress toward the officers. The video further reflects that plaintiff continued to resist the AUOF team until Holloway deployed the electronic shock shield.
>
> As for Holloway's use of the electronic shock shield, the video reflects that the single short deployment of the electronic shock shield was done in an effort to get plaintiff to stop resisting and to submit to restraints. *See, e.g., Bryant v. Johnson,* No. 7:11–cv–00075, 2012 WL 4458214, at *6 (W.D. Va. Aug. 21, 2012) (finding no excessive force where electronic shock shield was deployed to coerce an inmate into being weighed); *Collins v. Scott,* 961 F. Supp. 1009, 1016–17 (E.D.Tx.1997) (noting no constitutional violation where correctional officers used a shock shield when an inmate refused to submit to a strip search because the shield was the least restrictive means of maintaining control of the prisoner). The court further notes that plaintiff has not alleged that the deployment of the electronic shield was done for any purpose other than to restore order.
>
> Additionally, contrary to plaintiff's assertion otherwise, the video reflects that the AUOF team did not assault plaintiff once restraints were applied. The video further contradicts plaintiff's allegation that Jones or Averett hit him in the face with a black object as the video shows that Jones and Averett did not physically participate in the cell extraction.[] Moreover, the video reflects a rapid sequence of

events during which the AUOF team clearly is attempting to regain control over the situation, and the court accords deference to the AUOF team members' judgment under such circumstances. *See, Whitley,* 475 U.S. at 321 ("When the ever-present potential for violent confrontation and conflagration, . . . ripens into *actual* unrest and conflict, the admonition that a prison's internal security is peculiarly a matter normally left to the discretion of prison administrators . . . carries a special weight.") (internal quotations and citations omitted); *see also, Crayton v. Adams,* No. 7:13–cv–00078, 2013 WL 5918508, at * 1 (W.D. Va. Nov. 1, 2013) ("Federal courts are poorly equipped to second guess the split second security decisions of prison officials.") Accordingly, the court finds that the amount of force used did not outweigh the need for the force, and this *Whitley* factor also weighs in favor of defendants and against plaintiff.

The court next considers the third *Whitley* factor, the extent of any threat posed by plaintiff to the staff or other inmates, as reasonably perceived by defendants based upon the facts known to them at the time. Plaintiff, as an Hcon inmate with multiple disciplinary infractions, posed a threat to both staff and institutional security because he started a fire in his cell and refused to obey repeated direct orders to submit to restraints. Plaintiff further posed a threat to the AUOF team because he charged the team using his mattress as a shield when Polk staff attempted to remove him from his cell to apply restraints. Accordingly, the third *Whitley* factor weighs in defendants' favor and against plaintiff.

Finally, the court considers the fourth *Whitley* factor, whether defendants made any efforts to temper the severity of a forceful response. The video in this case reflects that defendants made repeated efforts to get plaintiff to voluntarily submit to restraints. The record further reflects that plaintiff resisted defendants' efforts to regain control until after the shock shield was deployed. Once plaintiff was subdued and placed in restraints, the officers calmly brought plaintiff to his feet and escorted him to the medical unit. As stated, the video contradicts plaintiff's assertions that any defendant struck plaintiff once plaintiff was restrained. Based upon the foregoing, viewing the evidence in the light most favorable to plaintiff, the court finds that the fourth *Whitley* factor weighs in favor of defendants and against plaintiff.

Viewing the evidence in the light most favorable to plaintiff, the court finds that each of the *Whitley* factors weigh in favor of defendants and against plaintiff. Accordingly, the court finds that defendants did no [sic] use force wantonly and maliciously for the

>           purpose of causing harm, and plaintiff is unable to establish a
>           constitutional violation.

*Id.* at *7–8.

The same reasoning would apply in this case. The video in this case shows that a negotiator arrived at Plaintiff's cell prior to the second cell extraction and attempted to convince Plaintiff to voluntarily cuff up. *See* Ex. 24 to the Report. The negotiator tells Plaintiff if he voluntarily cuffs up, the officers will not need to come in. Plaintiff responds that he is not worried about them coming in because they've already fucked him up once today, and he is ready because he has his weapon and the water and can "electrocute the shit out of somebody." *Id*. He repeats that he is "ready." Plaintiff states that his body is burning from the mace used earlier. The negotiator asks again if he will cuff up to be moved and Plaintiff responds "no." The negotiation then ends, and the officers step up to the cell door. *Id*. Plaintiff goes over to the exposed outlet and holds onto the protruding wires.

The officer orders Plaintiff to come to the door to be restrained and warns Plaintiff that if he refuses to comply an electric shield will be used. *Id*. Plaintiff says that he has electronics too (pointing to the outlet) and is willing to "zap everyone." *Id*. The officer gives the warning again and has the officer with the shield come to the door to audibly demonstrate the shield. *Id*. Plaintiff bends forward laughing in response to the audible shocking sounds. *Id*. The officer then warns Plaintiff that the device delivers 50,000 volts and that he may experience loss of muscle control and may involuntarily defecate and urinate himself. *Id*. Plaintiff then comes to the cell door and tells the officer that they can't zap him because he is in water. The officer again orders Plaintiff to come to the door to cuff up. *Id*. Plaintiff says that it is illegal if they zap him while he is in water, and the officer responds that it is not illegal. *Id*.

The officers then enter the cell, and Plaintiff continues to resist while they are deploying

the shield and attempting to cuff him. Plaintiff then responds that they just hit him in the face with the shield and calls them "dummy," "motherfucker," and "bitches." *Id*. Plaintiff continues to resist until he is finally cuffed. *Id*. Plaintiff continues to talk to the officers and asks them to adjust his cuffs. They adjust the cuffs and help him to stand up and sit in the wheelchair. *Id*. Plaintiff continues to yell and threatens to headbutt one of the officers. *Id*. Plaintiff's cheek is bleeding from the contact with the shield. When medical staff offer to come clean his face, Plaintiff refuses stating that he wants pictures taken. *Id*.

Plaintiff had a forced extraction a few hours earlier that day in which he refused orders to be restrained. Prior to the second cell extraction, Plaintiff flooded his cell and tore the metal receptacle plate off the wall, exposing the wiring. A negotiator was used to talk to Plaintiff but was unsuccessful. Plaintiff continued to disregard multiple orders to submit to restraints. Defendants gave Plaintiff multiple warnings prior to entering his cell. Although Plaintiff alleges that his cheek was cut when the shield made contact with his face, Plaintiff has not alleged that he suffered any injuries from the electric shock. *See Bryant v. Johnson*, 2012 WL 4458214, at *5 (W.D. Va. 2012) (finding no excessive force where shock shield was used, noting that "[t]he two, one-second bursts caused no medical complication, unlike physical force, and no lingering effects, unlike pepper spray, and plaintiff did not suffer any injury from the NOVA shield") (citing *Collins v. Scott,* 961 F. Supp. 1009, 1016–17 (E.D. Tx.1997) (noting no constitutional violation where correctional officers used a shock shield when an inmate refused to submit to a strip search because the shield was the least restrictive means of maintaining control of the prisoner)). Plaintiff only alleges an injury based on the shield making physical contact with his face and causing a laceration. The Report provides that the shield's contact with Plaintiff's face resulted in a minor injury, was unintentional, and was due to him struggling and being wet and slippery. (Doc. 14, at 23–24;

Doc. 23–1; Doc. 14–5, at ¶ 12.)

The videos clearly show that Plaintiff purposefully flooded his cell, and he does not deny that he did so. Plaintiff stated that they could not use the shield on him because of the water and stated that he could electrocute them with the exposed wires. *See Bardin v. Wright*, 2013 WL 7097894, at *2 (E.D. Ark. 2013) (prisoner indicated that he flooded his cell because he feared the officer would use the shock shield against him, and according to the prisoner "this would prevent the use of a shock shield because anyone standing in the water would be affected"), *adopted in part* 2014 WL 297708 (E.D. Ark. 2014). The officers did not utilize water for purposes of enhancing the electric shock. *Cf. Canada v. Rountree*, 2018 WL 11468427, at *6 (E.D. Va. 2018), *affirmed* 741 F. App'x 937 (4th Cir. 2018) (noting that another inmate testified that he stuck his arm through the slot in his cell door and a corrections officer shocked his arm with the NOVA shield while another officer poured water on his arm); *Jackson v. Barrere*, 2014 WL 1389291, at *1, 5 (M.D. La. 2014) (finding genuine issue of material fact where there was no evidence that plaintiff provoked officers and officers drug plaintiff to the shower, turned the shower on to allow the water to flow, and then hit him with the electric shield, then drug him to another room where they punched him in the face and stomach).

Plaintiff not only flooded his cell and refused to submit to restraints, but he also tore the metal receptacle plate off the wall, exposing the electrical wiring. Plaintiff voluntarily exposed himself to water and electricity. One officer involved in the cell extraction declared that he was also shocked when Plaintiff was shocked. (Doc. 23–1, at ¶ 6, Affidavit of Corrections Officer Moshe Goldman) ("When he was shocked I was also being shocked."). Furthermore, when the officers indicated that they intended to use the shield despite the water, Plaintiff could have avoided the use of the electric shield by agreeing to be cuffed. *See Canada*, 2018 WL 11468427, at *5

(finding that plaintiff was not docile and was not trying to avoid a confrontation where "he knew the extraction team was assembled and preparing to extract him from his cell" and if he "wished to avoid a cell extraction, he could have voluntarily offered to be cuffed").

Plaintiff has failed to show good cause why his claims should not be dismissed for the reasons set forth in the M&O II. Plaintiff has failed to show that any defendant used force maliciously and sadistically for the very purpose of causing harm, rather than in a good faith effort to maintain or restore discipline. Plaintiff has failed to state a claim of excessive force in violation of the Eighth Amendment. Plaintiff has also failed to state an Eighth Amendment claim based on his medical care or based on the alleged failure to remove the pepper spray from his body in a timely manner.

**IT IS THEREFORE ORDERED BY THE COURT** that Plaintiff's Motion to Amend Complaint (Doc. 28) is **denied.**

**IT IS FURTHER ORDERED** that this matter is **dismissed** for failure to state a claim.

**IT IS SO ORDERED**.

**Dated August 19, 2025, in Kansas City, Kansas.**

                                            **S/ John W. Lungstrum**
                                            **JOHN W. LUNGSTRUM**
                                            **UNITED STATES DISTRICT JUDGE**